Filed 2/25/16  In re E.S. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re E.S., a Person Coming Under the Juvenile Court Law. | B266030 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>       Plaintiff and Respondent,<br><br>       v.<br><br>ERICKA M.,<br><br>       Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK10836) |

APPEAL from orders of the Superior Court of Los Angeles County.  Philip L. Soto, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica Paulson-Duffy, Deputy County Counsel, for Plaintiff and Respondent.

_____

Ericka M. (mother) challenges juvenile court orders asserting dependency jurisdiction over her son, E.S., and removing him from her custody. We affirm the juvenile court orders.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2015, mother had primary custody of 11-year-old E.S.. Eric S. (father) had overnight visits every other weekend. However, mother and father were litigating custody issues in family court. E.S. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in March 2015, when mother was involuntarily hospitalized pursuant to Welfare and Institutions Code section 5150.[1] According to hospital records, maternal grandmother and maternal aunt took mother to a hospital for a psychiatric evaluation on March 10. The grandmother and aunt reported that since January 2015, mother had been "hearing voices, seeing things, and acting paranoid." Mother repeatedly complained of panic attacks. In the two weeks before the hospital visit, her symptoms had grown much worse. Notes from the hospital's psychiatric assessment indicated mother was "observed responding to internal stimuli during examination, and [she] stated multiple times during the interview that she was hearing people when there [were] no people around talking. [Patient] reports that she has been hearing non-stop loud voices 'terrorizing' her. She reports voices of people putting her down, and telling her things like, 'fuck you bitch,' and 'you're a racist,' and voices of people telling her they are going to use knives on her. She also reports that it feels like people have been stalking her recently." Mother admitted she had hung sheets in all of her windows to keep people from looking in. She had recently seen a man walking around her apartment.

The maternal aunt reported it had been difficult to get in touch with mother in the previous two weeks because she was "barricading herself in her house due to being paranoid." Mother had not slept for three days. She had seen a psychiatrist for the first time one or two months earlier. The psychiatrist prescribed a series of antidepressants,

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

but mother could not say when she had last taken the medicine. Mother was hospitalized around 20 years earlier after she broke up with a boyfriend and acted "out of control," including by "driving recklessly" on the wrong side of the street. The March 10 initial psychiatric assessment concluded that while mother did not present an acute risk of suicide or violence, she was a danger to herself because "her abilities to attend to the environment around her, identify, and avoid potentially dangerous and lethal situations are grossly impaired. . . . She also meets criteria for grave disability due to being paralyzed by her severe paranoia and delusions, and grossly impaired impulse control, and judgment." A 72-hour hold was initiated.

While in the hospital, mother told doctors she had been hearing the voices of her neighbors telling her they hated her and wanted to hurt her. She denied auditory or visual hallucinations in the hospital. She still feared her neighbors and wanted to move as soon as possible. She reported the medication she was receiving helped her feel better. Mother was discharged after three days. Although E.S. had been staying with father, mother picked him up from school the day of her discharge.

According to father, maternal aunt told him that after mother was released from the hospital, she began barricading herself in her apartment again and put sheets over the windows. Father filed an ex parte in family law court seeking, and receiving, custody of E.S. In a March 23 interview with DCFS, father reported the maternal aunt informed him that prior to the hospitalization, mother kept E.S. awake for three days because she was hearing voices. Maternal aunt indicated she could no longer help mother because mother was violent. The maternal aunt was now refusing to monitor mother's visits because mother tried to take E.S. away from the house and she refused to listen to the maternal aunt. Father said mother isolated herself and E.S. and would not allow him to go outside or have friends.

E.S. told DCFS mother said she was hearing voices and she was "up all night for many nights." This scared E.S. Mother also told E.S., "I love you," over and over, and this also scared E.S. E.S. recounted that he got himself up in the mornings and did not eat breakfast. Mother took him to school and picked him up. He admitted that he came

3

home and watched television, although he knew he should be studying. Mother cooked dinner or got a pizza, but sometimes they ran out of food. When that happened, E.S. said he either did not eat or mother would buy food. After dinner, mother went to her bedroom to work. E.S. said he had friends, although he could not name them. He also told a social worker he did well in school, he went to school every day, and he was never tardy.

On or around March 28, the family law court returned custody to mother.[2] DCFS interviewed mother on March 30. Mother denied all neglect and abuse allegations. She said father stressed her out and her hospitalization was a mistake. According to mother, she received no diagnosis and the hospital held her for observation due to a stomach illness. She later claimed she was hospitalized due to an allergic reaction to medication. She denied any psychiatric hold. She also said she was not in need of any mental health treatment, she was not advised to seek treatment, and she had stopped taking an anti-depressant last year and had never taken any other psychiatric medicine. When the social worker told mother she knew the hospitalization was due to a section 5150 hold, mother insisted it was a mistake and she just had a reaction to abruptly stopping the antidepressant. Mother denied ever hearing voices. She claimed father had fabricated everything. She insisted she had a real problem with her neighbors and could hear them talking.

On April 7, E.S.'s teacher told a DCFS social worker she was concerned about E.S. because he was failing subjects, had excessive absences, and always looked tired. The teacher's meetings with mother did not yield improvements because mother did not follow through. The teacher reported mother appeared to be "out there," and came to school "with black eye makeup smeared all over her face" and torn shirts. Mother seemed "not entirely aware of things."

---

**2**     According to the detention report, father told a social worker the court gave custody back to mother but he was unclear why.

4

Although the maternal aunt told DCFS she took mother to the hospital only because of stomach cramping, father later played the social worker a voicemail from the aunt apologizing for not supporting him in family court. In the voicemail, the aunt told father her family had pressured her not to get involved. She said mother was "not in her right mind."

Around this time in early April, mother informed father she would not allow E.S. to visit him in April because E.S. had spent more time with father than he should have in March due to mother's hospitalization and the temporary custody change. This was in violation of an existing visitation order. Father had not seen E.S. since March 23. The maternal aunt told father E.S. wrote a note while at the aunt's house stating he hated mother and wanted to break her bones. Mother did not answer father's telephone calls for several days. On April 10, DCFS took E.S. into protective custody.

Mother met a social worker at a police station to receive notice of the court hearing and a copy of the removal order. Mother was disheveled and spoke loudly. She told the social worker she had been out of her apartment for several days because of the constant noise she was hearing. Mother explained she and E.S. were not safe in the apartment because a man in the apartment was stalking mother. She saw the man carrying a gun into his apartment the day she was hospitalized. Mother also told the social worker "her garage door has been opening and shutting 10-12 times several nights a week by people that want to hurt her." She heard noises at her mother's house and at her aunt's house so she did not feel safe at either place. She intended to sue her landlord for the noises and the "constant harassment" from her neighbors. She had stopped paying rent because the building was "uninhabitable."

On April 15, the juvenile court detained E.S. and released him to father. In a May 2015 jurisdiction and disposition report, E.S. said the neighbors were "being annoying" to mother, and she acted worried and anxious. As a result, they moved in with the maternal aunt. E.S. saw the neighbors and was not afraid of them. He never saw them do anything to mother or say anything to her. He did recall the neighbors played loud music. E.S. said mother helped him with homework and did not work in the afternoon. She used

5

sheets and drapes to cover the windows because the blinds were broken. He was not afraid of her.

Father said the custody case in family law court had been ongoing since E.S. was two years old. Father reported E.S. told him mother was hearing voices and that E.S. was scared. Mother told father she was being evicted from her apartment. She also admitted to him that she was mentally unstable. Father said mother had displayed violent behavior around seven years earlier when she threw a bicycle through father's window and threw a toy at E.S. that hit his forehead.

Mother admitted that when she was hospitalized in March she was diagnosed with mood disorder and psychosis, but she did not take medication after being discharged. She had been under a lot of stress due to the custody fight with father, and harassment from her neighbors. She was having anxiety attacks. However, mother denied ever hallucinating. She asserted father made false allegations against her because he wanted full custody of E.S. In mid-April, mother went to a psychiatrist and received a new prescription. She had scheduled appointments with a counselor and a psychiatrist for June. She was willing to complete all programs necessary. However, the DCFS report noted mother had asked one of the social workers if she had to continue taking psychotropic medication.

The maternal grandmother told DCFS mother's psychosis was only temporary and was brought on by the harassment of the neighbors, which led to mother not sleeping for three days. The grandmother was unaware of mother ever having hallucinations or hearing voices. Instead, the grandmother said mother was paranoid because she could hear the neighbors swearing at her or saying things to her near a window. The maternal aunt also told DCFS mother had a nervous breakdown because of her neighbors and because she could not sleep. She denied that mother had been evicted. She also denied being aware of mother hallucinating or hearing voices.

At the May 20 jurisdiction and disposition hearing, mother testified that when she was hospitalized in March 2015, E.S. was at the maternal aunt's house. Mother at no time tried to hurt E.S. and did not leave him without supervision. She testified she now

6

had a diagnosis of mood disorder and was taking medication.  She was aware of the concerns about E.S.'s academic performance and she was working with him to improve it.

The trial court sustained a dependency petition alleging mother's mental and emotional condition endangered E.S.'s physical health and safety and placed him at risk of physical harm.  At disposition, the court removed E.S. from mother's custody and placed him with father.  The court ordered mother to take parenting classes, take her prescribed psychotropic medication, undergo individual counseling, and comply with a psychiatric evaluation.  The court ordered mother to have monitored visits; DCFS was given the discretion to liberalize the visits.

Mother timely appealed.

## DISCUSSION

Mother contends the evidence was insufficient to support the juvenile court order asserting dependency jurisdiction over E.S.  Mother contends her mental health did not cause E.S. serious physical harm or illness, as required for jurisdiction under section 300, subdivision (b).  She also contends there was insufficient evidence to remove E.S. from her custody.  We disagree.  There was substantial evidence that mother's conduct placed E.S. at substantial risk of serious physical harm or illness and that the jurisdiction and placement orders were necessary.

## I.    Substantial Evidence Supported the Jurisdictional Finding

"We affirm a juvenile court's jurisdictional and dispositional findings if they are supported by substantial evidence.  [Citation.]  'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'  [Citation.]"  (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103.)

"Section 300, subdivision (b) provides a basis for assertion of dependency jurisdiction if '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her

7

parent . . . to adequately supervise or protect the child. . . .' ' "A jurisdictional finding under section 300, subdivision (b), requires: ' "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citation.]' [Citations.] The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).' [Citation.]" ' [Citation.]" (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111.)

When mental illness is a factor in the parent's inability to provide regular care for the child, DCFS " 'has the burden of showing specifically how the minors have been or will be harmed and harm may not be presumed from the mere fact of mental illness of a parent.' [Citation.]" (*In re A.G.* (2013) 220 Cal.App.4th 675, 684.) DCFS met its burden in this case. In March 2015, mother exhibited signs of severe mental illness that affected her behavior and also negatively affected E.S. Mother heard abusive voices constantly, hallucinated, and displayed paranoid behavior. She barricaded herself in the apartment she shared with E.S. and did not sleep for three days straight. During this time she reportedly kept E.S. awake and frightened him with her behavior. Moreover, her symptoms were so severe the maternal grandmother and maternal aunt took her to the hospital for a psychiatric assessment, resulting in mother being held for three days pursuant to section 5150. The hospital notes opined mother was a danger to herself because her ability to recognize and avoid potentially dangerous and lethal situations was grossly impaired. The notes further described mother as "paralyzed by her severe paranoia and delusions, and grossly impaired impulse control, and judgment."

Further, mother had been exhibiting symptoms of severe mental illness for months. Simultaneously, E.S. was doing poorly in school. According to his teacher, E.S. was failing his subjects, was frequently absent, and always looked tired. The teacher reported mother came to school with makeup smeared on her face, causing other students to stare at her. The teacher said that although she had met with mother about E.S.'s school performance, mother did not follow through on the teacher's suggestions.

E.S. told DCFS mother's behavior scared him. He also indicated that sometimes they did not have food and, when that happened, he did not eat if mother did not buy food. This evidence all suggested that mother's mental illness was increasingly making her unable to provide adequate care or supervision of E.S.

After the hospitalization, mother did not take the medication prescribed for her. She denied that she had been hallucinating or hearing voices, yet the notes from the psychiatric assessment indicated mother was hearing voices as she was being examined, and the aunt and grandmother indicated mother had been hearing voices. There was evidence that after mother was discharged she again barricaded herself in her apartment and continued to experience near-debilitating anxiety about the real or perceived hostilities from her neighbors. When DCFS removed E.S. and met mother to deliver the removal order, mother talked about seeing a man stalking her in her apartment, and hearing her garage door open multiple times by people who wished to harm her. She explained she heard disturbing noises not only at her own apartment, but also at the homes of her mother and aunt. Mother did not feel safe at any of their homes. By this time, mother had told father he could not see E.S. that month. E.S. appeared "traumatized and depressed."

Although mother appeared to have improved by the time of the jurisdiction hearing, less than two months had passed since E.S. had been taken into protective custody. While mother was now taking medication, she also asked a social worker if she had to *continue* taking psychotropic medication. This was a reason for concern about mother's intended compliance with the medication regimen, particularly in light of mother's statements that her prior mental instability was related to a bad reaction to two prescription drugs she started taking in September 2014, but which she abruptly stopped without consulting her doctor.

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' [Citation.]" (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.) The evidence

9

indicated mother's mental condition created a substantial risk of serious harm to E.S. Her mental state had deteriorated to such an extent that hospitalization was necessary, and even then, mother did not immediately recognize the need for medication, causing her to remain in an extremely paranoid state. There was evidence this mental illness rendered her unable to provide adequate care and supervision of E.S. She stayed awake for three days straight and kept E.S. awake in the process; she was unable to follow through on E.S.'s teacher's recommendations to help him improve at school; and there was evidence she had isolated herself and E.S. from others, including family. Given the seriousness of the risk and the short period of time since mother's mental health had stabilized with medication, substantial evidence supported the juvenile court's jurisdiction order.

## II. The Juvenile Court Did Not Err in Removing E.S. From Mother's Custody

Under section 361, subdivision (c)(1), "a dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody."

Substantial evidence supported a finding that E.S. was at substantial risk of harm if returned to mother's home and there were no reasonable means to protect him without removal from mother's custody. (*In re J.C.* (2014) 233 Cal.App.4th 1, 6.) As explained above, mother's mental or emotional problems had placed E.S. at substantial risk of harm. Even after her hospitalization, mother did not immediately begin taking psychotropic medication and she remained extremely paranoid. By the time of the jurisdiction and disposition hearing, mother was taking psychotropic medication, but she had only been doing so for one month and would not see a counselor or psychiatrist for another month. According to mother, part of what precipitated the onset and worsening

10

of her symptoms was the dispute with father over custody of E.S.  That source of stress had not gone away.

" 'A removal order is proper if based on proof of a parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent.  [Citation.]  "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child."  [Citation.]  The court may consider a parent's past conduct as well as present circumstances.'  [Citation.]"  (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.)  Substantial evidence supported the juvenile court's removal order.

## DISPOSITION

The juvenile court orders are affirmed.

BIGELOW, P.J.

We concur:

RUBIN, J.

GRIMES, J.

11